IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JIM S. ADLER, P.C. and JIM ADLER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | No. 3:19-cv-2027-K-BN |
| | § | |
| ANGEL L. REYES & ASSOCIATES PC | § | |
| D/B/A REYES BROWNE REILLY, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

This case has been referred to the undersigned United States magistrate judge for pretrial management under 28 U.S.C. § 636(b) and a standing order of reference from United States District Judge Ed Kinkeade. *See* Dkt. No. 14.

Defendant Angel L. Reyes & Associates d/b/a Reyes Brown Reilley has filed a Motion to Dismiss Plaintiffs' Complaint or Alternative Motion for a More Definite Statement. *See* Dkt. No. 10. Plaintiffs Jim S. Adler, P.C. (the "Adler Firm") and Jim Adler have filed a response, *see* Dkt. No. 11, and Defendant has filed a reply, *see* Dkt. No. 12.

For the reasons and to the extent explained below, the undersigned recommends that the Court grant in part and deny in part the motion to dismiss and motion for more definite statement.

## Background

This is a trademark infringement case between two personal injury law firms.

1

Plaintiffs contend that Defendant intentionally uses its trademarks to confuse consumers using mobile device to search online for Plaintiffs.

The Adler Firm is a Texas personal injury firm, representing injured parties in all types of personal injury cases, with a focus on auto accidents and commercial vehicle/eighteen-wheeler accidents. The Adler Firm was formed and is led by Jim Adler, who has practiced law in Texas for over fifty years. It currently has four offices in Houston, Dallas, San Antonio, and Channelview.

Jim Adler and the Adler Firm became one of the first lawyers and law firms to advertise on television after the United States Supreme Court upheld the right of lawyers to advertise their legal services in 1977. They currently advertise on television, radio, billboards, and the internet. In 2015, the Dallas Business Journal wrote that "Jim Adler, 'The Texas Hammer,' has used an aggressive, memorable advertising campaign to make his law firm a household name in several areas of the state" and noted that, "[a]s far as personal injury lawyers go, Jim Adler might be the most well known in Texas." Dkt. No. 1 at 4.

Jim Adler and the Adler Firm have consistently and continuously used several trademarks, including JIM ADLER, THE HAMMER, THE TEXAS HAMMER, and EL MARTILLO TEJANO (collectively, the "Adler Marks"), in advertising across all media formats. The Adler Marks are registered with the United States Patent and Trademark Office.

This lawsuit involves use of the Adler Marks in internet advertising.

Plaintiffs purchase keyword search advertising to drive internet traffic to the Adler Firm, including purchasing keyword ads through Google's search engine. Plaintiffs purchase their own marks or generic terms related to the type of cases they handle. For example, Plaintiffs purchase keyword ads for "Jim Adler" or "Texas Hammer" as well as "car accident lawyer" for more generic searches. Most of the keyword ads Plaintiffs purchase are for someone searching for the Adler Marks rather than generic terms. All search engine advertisements purchased by Plaintiffs prominently include the Adler Marks and clearly identify the Adler Firm as the source of the advertisement, as shown in this example:



Dkt. No. 1 at

Plaintiffs allege Defendant is engaged in a scheme to trade on the goodwill and reputation of Plaintiffs and the Adler Marks in Texas and to deceptively induce prospective clients who are using mobile devices to specifically seek out Jim Adler and the Adler Firm into mistakenly contacting and engaging Defendant instead.

Defendant is a personal injury law firm in Dallas, Texas and through its website at reyeslaw.com advertises itself as "Personal Injury Attorneys & Car Accident Lawyers." Defendant operates a call center associated with that site through which Defendant solicits personal injury cases, including from calls it receives based on its website and search engine advertisements.

Defendant purchases the Adler Marks as keyword advertisements through Google's search engine on mobile devices and uses them in conjunction with similar ads that incorporate Plaintiffs' marks into the text of Defendant's advertisement. According to Plaintiffs, "Defendant purchases the marks as keyword ads on mobile devices because of the likelihood that consumers will be confused and quickly click on Defendant's ad, including the click-to-call button, not realizing that the link is not affiliated with Plaintiffs." Dkt. No. 1 at 10 ¶ 39.

As a result, Google searches for "Jim Adler," "The Texas Hammer," and "El Martillo Tejano" result in search pages that display Defendant's advertisements, often directly below one or more of the Adler Marks – and before Plaintiffs' own similar ads – while often incorporating Plaintiffs' marks into the text of Defendant's advertisements, as shown by these examples:

Example Ad #1



Example Ad #2



Example Ad #3



Dkt. No. 1 at 11-12.

Plaintiffs contend that these examples show that Defendant's online advertisements do not always specifically name a lawyer or law firm as the source of the advertisement. They include headers in larger and distinct font that allegedly incorporate the Adler Marks in phrases such as "We Hammer Insurance Companies" or "Need a Hammer for Your Case?" In the smaller text of the body of the advertisement, the firm name is not provided or is referred by the initials "RBR," and the text of the ad includes the Adler Marks. For example, the text of Example Ad #2 reads "RBR will **hammer** the insurance company to ensure you get every dollar you deserve. Don't let them **hammer** your case down."

Plaintiffs allege that, by including the Adler Marks in the text of its ads, Defendant ensures that, when someone searches with the Adler Marks, the marks will appear in bold in Defendant's ads in the search results. Plaintiffs also allege that the landing page to which the consumer is directed when it clicks on one of the offending ads includes the "Hammer" mark but that Defendant's main website page does not.

Plaintiffs contend that consumers specifically searching for Jim Adler or the Adler Firm are likely to believe that Defendant's advertisements are for the Adler Firm or that Defendant is affiliated with Plaintiffs and that this is particularly true on mobile devices, where consumers are quickly searching, often when dealing with the stressful aftermath of an accident, where the typeface of the ads is much smaller, and where the only content displayed on the screen is an advertisement directly below one or more of the Adler Marks, which consumers have entered as a search term.

Defendant's mobile search engine ads often include both a link to its website and a "click-to-call" button that, when tapped, causes the mobile device to call a predetermined phone number for a call center operated by Defendant.

Example #4



Dkt. No. 1 at 14. Defendant's employees are directed to answer the calls with a generic greeting like "did you have an accident" or "tell me about your accident" instead of identifying Defendant.

Plaintiffs sued Defendant for trademark infringement, false designation of origin and false advertising, unfair competition, dilution, unjust enrichment, misappropriate of name or likeness, misappropriation of business opportunity, and tortious interference. *See* Dkt. No. 1.

Defendant seeks dismissal of Plaintiffs' claims under Federal Rule of Civil Procedure Rule 12(b)(6). Defendant contends that Plaintiffs fail to state claims for federal trademark infringement for three reasons.

First, Defendant argues that its use of Plaintiffs' marks as search engine keywords does not infringe Plaintiffs' trademark rights as a matter of law.

Second, Defendant argues that Plaintiffs fail to plead sufficient facts to show that its use of Plaintiffs' marks creates a likelihood of confusion.

And, third, Defendant argues that its use of the word "hammer" is protected by the fair use doctrine.

Defendant also seeks dismissal of the pendent state law claims. Alternatively, Defendant asks that Plaintiffs be required to file a more definite statement.

**Legal Standards**

I.   <u>Motion to Dismiss</u>

In deciding a Federal Rule of Civil Procedure 12(b)(6) motion, the Court must "accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205–06 (5th Cir. 2007). To state a claim upon which relief may be granted, Plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must plead those facts with enough specificity "to raise a right to relief above the speculative level." *Id*. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "A claim for relief is implausible on its face

when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

While, under Federal Rule of Civil Procedure 8(a)(2), a complaint need not contain detailed factual allegations, Plaintiffs must allege more than labels and conclusions, and, while a court must accept all of the Plaintiffs' allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A threadbare or formulaic recitation of the elements of a cause of action, supported by mere conclusory statements, will not suffice. *See id.* But, "to survive a motion to dismiss" under *Twombly* and *Iqbal*, a plaintiff need only "plead facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that the plaintiff contends entitle him or her to relief. *Johnson v. City of Shelby, Miss.*, 574 U.S. ____, 135 S. Ct. 346, 347 (2014) (per curiam) (citing FED. R. CIV. P. 8(a)(2)-(3), (d)(1), (e)); *accord N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015) ("To survive a Rule 12(b)(6) motion to dismiss, the complaint does not need detailed factual allegations, but it must provide the plaintiff's grounds for entitlement to relief – including factual allegations that, when assumed to be true, raise a right to relief above the speculative level." (footnote and internal quotation marks omitted)).

The United States "Supreme Court has made clear that a Rule 12(b)(6) motion turns on the sufficiency of the 'factual allegations' in the complaint." *Smith v. Bank*

*of Am., N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) (quoting *Johnson*, 135 S. Ct. at 347, and the Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted," *Johnson*, 135 S. Ct. at 346.

A court cannot look beyond the pleadings in deciding a Rule 12(b)(6) motion. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). Pleadings in the Rule 12(b)(6) context include attachments to the complaint. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). Documents "attache[d] to a motion to dismiss are considered to be part of the pleadings, if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). "Although the [United States Court of Appeals for the] Fifth Circuit has not articulated a test for determining when a document is central to a plaintiff's claims, the case law suggests that documents are central when they are necessary to establish an element of one of the plaintiff's claims. Thus, when a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claim." *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011). "However, if a document referenced in the plaintiff's complaint is merely evidence of an element of the plaintiff's claim, then the court may not incorporate it into the complaint." *Id.'*

II.   <u>Motion for More Definite Statement</u>

Under Federal Rule of Civil Procedure 12(e), "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response," and "[t]he motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired." FED. R. CIV. P. 12(e). "A motion for a more definite statement under Rule 12(e) is available where the pleading 'is so vague or ambiguous that the party cannot reasonably prepare a response.'" *Conceal City, L.L.C. v. Looper Law Enforcement, LLC*, 917 F. Supp. 2d 611, 621 (N.D. Tex. 2013) (quoting FED. R. CIV. P. 12(e)). "Motions for a more definite statement are generally disfavored." *Johnson v. BAE Sys. Land & Armaments, L.P.*, No. 3:12-cv-1790-D, 2012 WL 5903780, at *4 (N.D. Tex. Nov. 26, 2012) (internal quotation marks omitted). "When a defendant is complaining of matters that can be clarified and developed during discovery, not matters that impede [its] ability to form a responsive pleading, an order directing the plaintiff to provide a more definite statement is not warranted." *Id.* (internal quotation marks omitted).

## Analysis

I.   The Motion to Dismiss should granted in part and denied in part.

A.   Plaintiffs have stated claims for federal trademark infringement.

Plaintiffs assert claims for federal trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. §§ 1114(1), and unfair competition under Section 43 of the Lanham Act, 15 U.S.C. § 1125(a). *See* Dkt. No. 1 at 18. The same test for trademark infringement applies to both. *See John Crane Prod. Solutions., Inc. v. R2R*

*& D, LLC,* No. 3:11-cv-3237-D, 2012 WL 1571080, at * 2 n.2 (N.D. Tex. May 4, 2012) (citing *Amazing Spaces, Inc. v. Metro Mini Storage,* 608 F.3d 225, 236 n.8 (5th Cir. 2010)).

"To prevail on a claim of federal trademark infringement under the Lanham Act…a plaintiff must show (1) ownership of a legally protectible mark and (2) a likelihood of confusion created by an infringing mark." *All. for Good Gov't v. Coal. For Better Gov't,* 901 F.3d 498, 505 (5th Cir. 2018).

Defendant does not dispute that Plaintiffs own legally protected marks. It challenges only the likelihood-of-confusion element.

1. <u>Plaintiffs allege more than Defendant's purchase of its trademarks.</u>

Defendant argues that Plaintiffs fail to state a claim for trademark infringement and unfair competition, as a matter of law, because "Adler's trademark infringement claim is based on the allegation that Reyes purchased trademarked keyword advertisements through Google's search engine." Dkt. No 10 at 10. The purchase of a competitor's trademark as a keyword for search-engine advertising, without more, is not sufficient for a claim of trademark infringement. *See Tempur-Pedic N. Am., LLC v. Mattress Firm, Inc.*, Civil Action H-17-1068, 2017 WL 2957912, at *7-*8 (S.D. Tex. July 11, 2017) ("The mere purchase of AdWords alone, without directing a consumer to a potentially confusing web page, is not sufficient for a claim of trademark infringement.'); *see also* J. THOMAS MCCARTHY, 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION ("MCCARTHY") § 25A:7 (5th ed.) ("Almost all

District Courts have found that no likelihood of confusion was caused by the purchase of keywords alone.").

But Plaintiffs allege more than simply the purchase of a competitor's trademarks. Plaintiffs allege that Defendant: (1) used confusing advertisements with Adler keywords, often incorporating the Adler marks into the text of the ads in conspicuous fonts, *see* Dkt. No. 1 at ¶¶ 7, 39-41; (2) bid increasing higher amounts so that its ads were placed near or before Plaintiffs' ads, *see id.* at ¶¶ 8, 40, 45; (3) created special landing pages incorporating the Adler marks for those who clicked on the infringing ads, *see id.* at ¶ 42; (4) used click-to-call technology in the ads to cause consumers searching for Plaintiffs to mistakenly call Defendant before obtaining further information, *see id.* at ¶ 44; and (5) had call-center operators follow scripts designed to further confuse callers seeking Plaintiffs in the hopes of keeping them on the phone and ultimately convincing them to hire Defendant instead of Plaintiffs, *see id.* at ¶¶ 46-47.

2.  <u>Plaintiffs adequately plead a likelihood of confusion.</u>

A defendant's use of a plaintiff's marks in keyword search engine ads to direct users to the defendant may be unlawful if it causes consumer confusion. *See, e.g.,* *Abraham v. Alpha Chi Omega*, 781 F. Supp. 2d 396, 423 (N.D. Tex. 2011). Liability for trademark infringement depends on how the defendant is using the mark, "as every use of a mark is different." *Mary Kay, Inc. v. Weber,* 601 F. Supp. 2d 632, 646 (N.D. Tex. 2009). The crux of the issue is whether a defendant's keyword purchases, combined with the look and placement of the ads, creates a search results page that

misleads, confuses, or misdirects a consumer searching for a brand to the website of a competitor. *See TSI Prods., Inc. v. Armor All/STP Prods.*, Co., No. 3:17-cv-1331, 2019 WL 4600310, at *5 (D. Conn. Sept. 23, 2019) (denying motion to dismiss based on argument that "the purchase of a competitor's marks as keywords alone, without additional behavior that confuses consumers, is not actionable "because "[d]rawing all reasonable inferences in favor of" plaintiff, the Court found that the complaint "states a plausible claim that [defendant's] keyword purchases, combined with the look and placement of that defendant's advertisement, create a search results page which misleads, confuses or misdirects a consumer searching for a trademarked brand to the website of a competitor in a manner in which the source of the products offered for sale by the competitor is unclear.") (citing *See Edible Arrangements*, *LLC v. Provide Commerce, Inc.,* No. 3:14-cv-250, 2016 WL 4074121, at *1 (D. Conn. July 29, 2016)).

Courts consider a nonexhaustive list of eight factors to determine whether a party has established likelihood of confusion: (1) strength of the mark; (2) mark similarity; (3) product or service similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers. *See All. For Good Gov't*, 901 F.3d at 508. "'The absence or presence of any one factor ordinarily is not dispositive; indeed, a finding of likelihood of confusion need not be supported even by a majority of the ... factors.'" *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 & n.19 (5th

Cir. 2008) (quoting *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985)).

At the pleading stage, the court need not fully weigh all the factors − the test is simply whether the complaint's allegations, taken as true, show the claim of likelihood of confusion is plausible. *See John Crane*, 2012 WL 1571080, at *3 (citing *Twombly,* 550 U.S. at 570).

The first digit of confusion is the strength of the mark allegedly infringed. "Two separate considerations are relevant − the conceptual strength and the commercial strength of the mark." *Firebirds Int'l, LLC v. Firebird Rest. Grp.,* 397 F. Supp. 3d 846, 860 (N.D. Tex. 2019). Conceptual strength "considers where the mark falls on a spectrum: 'Marks may be classified as generic, descriptive, suggestive, or arbitrary and fanciful.... Within this spectrum the strength of a mark, and of its protection, increases as one moves away from generic and descriptive marks toward arbitrary marks." *Id*. (quoting *Am. Rice*, 518 F.3d at 330 (quoting *Falcon Rice Mill, Inc. v. Cmty. Rice Mill, Inc.*, 725 F.2d 336, 346 (5th Cir. 1984))). Commercial strength is the standing of the mark in the marketplace. *See id*.

Plaintiffs state facts showing that the Adler Marks are both conceptually and commercially strong. In addition to stating that the Adler Marks are inherently distinctive and famous in the State of Texas, *see* Dkt. No. 1 at ¶¶ 18, 19, Plaintiffs also allege:

> 22. In order to build a strong brand for aggressively representing Texas injury victims and their families, Jim Adler and the Adler Firm advertise on television, radio, billboards, and on the internet. The ADLER Marks are consistently used in Plaintiffs' advertisements across

all media formats. The ads themselves are strategically designed to position Jim Adler and the Adler Firm as leading attorneys capable of handling all types of personal injury claims, with an emphasis on auto and truck accidents. The bulk of Plaintiffs' advertising is in the three largest markets in Texas – Houston, San Antonio, and Dallas-Fort Worth.

22. Since 2000, the Adler Firm has spent over $100 million on television, internet, radio, and billboard advertisements targeting the Houston, San Antonio, and Dallas-Fort Worth markets.

23. For each of these three major Texas markets, Plaintiffs run numerous television advertisements in both English and Spanish on multiple television stations throughout the year. In Houston, Jim Adler and the Adler Firm run approximately 45,000 television commercials per year. In San Antonio, they run about 87,000 television commercials per year. And in Dallas-Fort Worth, Jim Adler and the Adler Firm run approximately 85,000 television commercials per year.

24. The use of television advertisements in these major Texas markets has allowed Jim Adler and the Adler Firm to reach millions of Texans and build an incredibly strong brand. The Houston market is the eighth largest television market in the nation, reaching more than 6 million viewers. The San Antonio market is the thirty-first largest television market in the nation, reaching more than 2.3 million viewers. The Dallas-Fort Worth market is the fifth largest television market in the nation, reaching more than 6.8 million viewers. Combined, Plaintiffs' television advertising allows them to reach over 15 million people – more than half of all Texans.

25. A review of the television advertisements Jim Adler and the Adler Firm ran in these major Texas markets showed that the commercials obtained significant exposure for the Adler Firm. In 2019, over a four-week period, not including commercials run on cable, television advertisements for Jim Adler and the Adler Firm repeatedly reached a large portion of the 25-to-54-year-old demographic in each of these major markets. In the Houston market, Plaintiffs' advertisements reached 70.4% of the demographic, with the average viewer seeing each ad 15.2 times, for 29,563,125 total impressions. In the San Antonio market, their advertisements reached 47.5% of the demographic, with the average viewer seeing each ad 14.0 times, for 6,420,146 total impressions. And in the Dallas-Fort Worth market, Plaintiffs' advertisements reached 58.7% of the demographic, with the average viewer seeing each ad 13.9 times, for 23,406,564 total impressions.

26. For each of these major Texas markets, Jim Adler and the Adler Firm run numerous radio advertisements in both English and Spanish on multiple radio stations throughout the year. For Houston, San Antonio, and Dallas-Fort Worth, Jim Adler and the Adler Firm run approximately 23,000 radio commercials per year in each market.

27. The use of radio advertisements in these major markets has allowed Jim Adler and the Adler Firm to reach millions of Texans and enhance their brand recognition. The Houston market is the sixth-largest radio market in the nation, reaching more than 5 million listeners. The San Antonio market is the twenty-sixth largest radio market in the nation, reaching more than 1.8 million listeners. And the Dallas-Fort Worth market is the fifth-largest radio market in the nation, reaching more than 5.3 million listeners. Combined, Plaintiffs' radio advertising allows them to reach over 12 million Texans.

28. A review of the radio advertisements Jim Adler and the Adler Firm ran in these major Texas markets showed that the commercials obtained significant exposure for the Adler Firm. In 2019, over a four-week period, radio advertisements for Jim Adler and the Adler Firm repeatedly reached a majority of the 25-to-54-year-old demographic in each of these major markets. In the Houston market, Plaintiffs' radio advertisements reached 87% of the demographic, with the average listener hearing each ad 8.9 times, for 23,519,600 total impressions. In the San Antonio market, their advertisements reached 67% of the demographic, with the average listener hearing each ad 9.2 times, for 6,258,000 total impressions. And in the Dallas-Fort Worth market, Plaintiffs' advertisements reached 56.1% of the demographic, with the average listener hearing each ad 7.1 times, for 13,133,600 total impressions.

29. For each of these major Texas markets, Jim Adler and the Adler Firm run numerous billboard advertisements in both English and Spanish. At any given time, Jim Adler and the Adler Firm have approximately 40 billboard advertisements in the Houston market, 20 in the San Antonio market, and 40 in the Dallas-Fort Worth market. On average, the billboard advertisements purchased by Jim Adler and the Adler Firm generate 25 to 30 million impressions per week.

30. Plaintiffs' advertisements, all of which prominently incorporate the ADLER Marks, have enabled Jim Adler and the Adler Firm to develop very strong brand recognition in Texas. In 2007, the Houston Chronicle wrote that "[e]verybody knows what Adler sounds like from his ceaseless

TV commercials." In 2015, the Dallas Morning News named one of Plaintiffs' television commercials to a list of five of the most memorable attorney ads in Dallas-Fort Worth. More recently, a montage comprised of Plaintiffs' English- and Spanish-language television advertisements was featured on a 2019 episode of *Last Week with John Oliver*, an Emmy-award winning HBO news satire program broadcast around the globe.

31. As a result of Plaintiffs' long use and promotion of the ADLER Marks, the marks have become distinctive to designate Plaintiffs, to distinguish Plaintiffs and their services from those of others, and to distinguish the source or origin of Plaintiffs' services. As a result of these efforts by Plaintiffs, the consuming public throughout the United States, including in Texas, widely recognizes and associates the ADLER Marks with Plaintiffs.

*Id.* at ¶¶21-31.

The second digit of confusion is similarity of the marks. Defendant argues that there is no similarity of use because it does not use any of the Adler Marks within the text of its Google advertisements. But "[i]n the Fifth Circuit trademark visibility has not been recognized to support a finding of likelihood of confusion." *Am. Can! v. Car Donations Found.*, No. 3:18-cv-1709-G, 2019 WL 1112667, at *10 (N.D. Tex. Mar. 11, 2019). "Further, the precedent of this court does not suggest that lack of visibility is determinative in keyword advertising cases, which similarly concern visible search results placement caused by invisible use of a trademark." *Id.* Plaintiffs allege that Defendant uses terms similar to Plaintiffs' registered trademarks and uses the identical marks as keywords to manipulate search engine results and confuse consumers, including using Alder's marks in the ads themselves.

The third digit of confusion is similarity of the products or services. Plaintiffs and Defendant are personal injury lawyers in the same markets. The fact the

defendant is a competitor providing the same class of services weighs heavily in favor of a finding the defendant's use of the plaintiff's mark is likely to cause confusion. *See Edible Arrangements*, 2016 WL 4074121, at *8. Likewise, use of a competing law firm's marks in keyword ads when the parties provide the same type of legal services is strong evidence of likelihood of confusion. *See Binder v. Disability Grp., Inc.*, 772 F. Supp. 2d 1172, 1176 (C.D. Cal. 2011).

The fourth digit of confusion is the identity of the consumers. Defendant does not dispute Plaintiffs are close competitors or that they compete to reach the same consumers: Texas personal injury plaintiffs and their families. *See* Dkt. No. 10 at 17; Dkt. No. 1 at ¶¶ 10, 38. When a competing law firm uses another's marks for keyword advertising to reach the same potential clients, there is strong evidence of likelihood of confusion. *See Binder*, 772 F. Supp. 2d at 1176.

The fifth digit of confusion is the identity of the advertising media used. Plaintiffs and Defendant both purchase and display keyword ads on mobile devices. When two competing law firms both use the internet to market their services and rely on it to obtain clients, this factor weighs in favor of finding the likelihood of confusion. *See id.*

The sixth digit of confusion is the defendant's intent. In their complaint, Plaintiffs state that Defendant uses the Adler marks in an intentional scheme to confuse consumers specifically searching for Plaintiffs and, as a result, divert consumers to Defendant. A defendant's intended use of allegedly infringing marks with knowledge of the plaintiff's prior use of mark may give rise to a presumption

that the defendant intended to cause public confusion. *See Conan*, 752 F.2d at 151 n.2. This factor weighs in favor of a finding of likelihood of confusion or, at the very least, is sufficient to create a question of fact on intent and the likelihood of confusion.

The seventh digit of confusion is evidence of actual confusion. Consideration of this factor is premature because Plaintiffs are not required to plead or provide evidence of actual confusion at the motion to dismiss stage.

The eighth digit of confusion is the degree of care exercised by potential purchasers. Plaintiffs state that Defendants purchase the Adler Marks primarily for internet advertising targeting consumers searching those marks from mobile devices because those consumers are more likely to be confused by Defendant's ads. *See* Dkt. No. 1 at ¶¶ 39, 44.

Taking as true the allegations of Plaintiffs' complaint and considering them in the light most favorable to Plaintiffs as measured against the eight digits, Plaintiffs plausibly show that there is a likelihood of confusion.

3. Defendant has not shown that Plaintiffs' trademark infringement claims <u>are precluded by the fair use defense as a matter of law</u>.

Defendant argues that its use of the word "hammer" is protected by the Lanham Act's statutory fair-use defense. *See* Dkt. No. 10 at 11-19. To assert a successful fair use defense to a trademark infringement claim, the defendant must prove three elements: that the use was made (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith. *See* 15 U.S.C. § 1115(b)(4). Because fair use is an affirmative defense, it often requires consideration of facts outside of the complaint and thus is inappropriate to resolve on a motion to dismiss. But affirmative

defenses may be adjudicated at the pleading stage where the facts necessary to establish the defense are evident on the face of the complaint. *See Kelly v. Nichamoff*, 868 F.3d 371, 374 (5th Cir. 2017). Plaintiffs, in rebutting Defendants' arguments, are held only to the usual burden of a motion to dismiss: they must plead sufficient facts to plausibly suggest that they are entitled to relief. *See Iqbal*, 556 U.S. at 678.

Plaintiffs contend that Defendant's use of the word "hammer" constitutes use as a mark. Plaintiffs allege Defendant uses the Adler Marks "The Hammer" and "The Texas Hammer" as marks in the text of its internet search results pages and provides images of examples: "We Hammer Insurance Companies," "Need a Hammer for Your Case?" and "RBR will **hammer** the insurance companies to ensure you get every dollar you deserve. Don't let then **hammer** your case value down." Dkt. No. 1 at 11-12 (emphasis in original). "We Hammer Insurance Companies" and "Need a Hammer for Your Case?" are in large print and the word "hammer" also appears in bold. *See* MCCARTHY § 3.4 ("Some of the common markers of whether a word, phrase or picture is being used as a trademark are: larger-sized print, all capital letters or initial capital letters, distinctive or different print style, color, and prominent position on label or in advertising.").

Defendant asserts that it uses the word "hammer" generically within its ordinary, dictionary meaning and distinguishes its use of the word "hammer" from Plaintiffs'. Defendant argues that it uses the word "hammer" as a noun or verb in sentences to "convey[ ] to internet users that it will pursue its client's case strenuously, forcefully and compellingly." In contrast, it argues that Plaintiffs use the

word "hammer" as a trademark or source identifier and, specifically, "as part of a proper noun, title or moniker." Dkt. No. 10 at 14.

And Defendant observes that the Alder Marks "The Hammer" and "The Texas Hammer" include the article "the," whereas its use of the word "hammer" does not. But the inclusion of articles in the registered trademark is "insignificant in determining the likelihood of confusion." *In re Norwood Prods, Inc.,* 223 U.S.P.Q. 1034, 1034 (T.T.A.B. 1984).

Defendant also argues that the mere fact that someone owns a mark that contains a particular word or phrase does not grant the holder the exclusive right to use that word or phrase commercially:

> Then what new rights does the trademark confer? It does not confer a right to prohibit the use of the word or words. It is not a copyright…A trademark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his…When the mark is used in a way that does not deceive the public, we see no such sanctity in the word to prevent its being used to tell the truth. It is not taboo.

Dkt. No. 10 at 11 (quoting *G.D. Searle & Co. v. Hudson Pharm. Corp.*, 715 F.3d 837, 843 (3d Cir. 1983)). But, here, Plaintiffs allege that Defendant uses the word "hammer" in a way that deceives internet consumers searching for the Adler Marks on mobile phones. In the mobile-ad context, which requires ads occupy minimal screen space and use only small amounts of screen space, they allege that Defendant's use of the term "hammer" multiple times in a single ad deceptively directs consumers searching the Adler Marks away from Plaintiffs to Defendant. *See* Dkt. No. 1 at § 40.

Defendants contend that they acted in good faith because the Professional Ethics Committee for the State Bar of Texas − addressing the question "Does a lawyer violate the Texas Disciplinary Rules of Professional Conduct by using the name of a competing lawyer or law firm as a keyword in the implementation of an advertising service offered by a major search-engine company?" − concluded that "given the general use by all sorts of businesses of names of competing businesses as keywords in search-engine advertising, such use by Texas lawyers in their advertising is neither dishonest nor fraudulent nor deceitful and does not include misrepresentation." PROFESSIONAL ETHICS COMMITTEE FOR THE STATE BAR OF TEXAS, Opinion 661 (July 2016). The Committee noted that its opinion addressed only whether the use of a competitor's name in internet search-engine advertising programs violates the Texas Disciplinary Rules of Professional Conduct. And it explained that, "depending on the circumstances, a Texas lawyer advertising through keywords on internet search engines may be subject to other requirements or prohibitions imposed by federal or state law or by professional ethics rules of other jurisdictions." *Id.* at 3.

The facts necessary to establish the fair use doctrine are not evident on the face of the complaint, and, taking Plaintiffs' allegations as true, Plaintiffs have sufficiently pleaded plausible facts to show that they are entitled to relief. At this stage of the proceedings, Plaintiffs have stated claims for federal trademark infringement and unfair competition.

B. Plaintiffs adequately pleaded state law claims.

Plaintiffs bring claims for common law trademark infringement and unfair competition, dilution under Texas law, unjust enrichment, misappropriation of name or likeness, misappropriation of business opportunity, and tortious interference. *See* Dkt. No. 1 at 19-20.

1. Plaintiffs state common law trademark infringement and unfair <u>competition claims.</u>

For the reasons stated above, the Court should deny the motion to dismiss as to Plaintiffs common law trademark and unfair competition claims because "[a] determination of a likelihood of confusion under federal law is the same as the determination of a likelihood of confusion under Texas law for a trademark infringement claim." *Elvis Presley Enter., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998).

2. <u>Plaintiffs state a claim for dilution under Texas law</u>

Under Texas law, "'the owner of a mark that is famous and distinctive ... in this state is entitled to enjoin another person's commercial use of a mark ... if use of the mark ... is likely to cause the dilution of the famous mark.'" *Springboards to Educ., Inc. v. Scholastic Book Fairs, Inc.*, 3:17-cv-54-B, 2018 WL 1806500, at *5-*6 (N.D. Tex. Apr. 17, 2018) (quoting TEX. BUS. & COM. CODE § 16.103(b)). A mark is famous under Texas law if it

> is widely recognized by the public throughout this state or in a geographic area in this state as a designation of source of the goods or services of the mark's owner. In determining whether a mark is famous, a court may consider factors including:

(1) the duration, extent, and geographic reach of the advertisement and publicity of the mark in this state, regardless of whether the mark is advertised or publicized by the owner or a third party;

(2) the amount, volume, and geographic extent of sales of goods or services offered under the mark in this state;

(3) the extent of actual recognition of the mark in this state; and

(4) whether the mark is registered in this state or in the United States Patent and Trademark Office.

*Id.*

Defendant contends that Plaintiffs' Texas dilution claim fails because "fame in only a limited geographical area … will not support a dilution claim." Dkt. No. 10 at 19. Defendant's argument is built on cases decided under the Federal Trademark Dilution Act. *See id.* at 25-27; 15 U.S.C. § 1125(c)(2)(A) ("[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner.").

But, unlike the federal statute, a plaintiff can succeed on a dilution claim under the Texas statute if its mark is famous in a smaller geographic region. *See YETI Coolers, LLC v. JDS Indus., Inc.,* 300 F. Supp. 3d 899, 914 n.7 (W.D. 2018) ("Texas law imposes the same requirement, albeit with a different geographic scope."); *De Boulle Diamond & Jewelry, Inc. v. Boulle, Ltd.*, No. 3:12-cv-1462-L, 2015 WL 5033893, at *3 (N.D. Tex. Aug. 25, 2015) (noting the possibility the scope of a dilution claim under the Texas statute could be limited to a single city); *Emerald City Mgmt., LLC v. Kahn*, No. 4:14-cv-358, 2016 WL 98751 (E.D. Tex. Jan. 8, 2016) (denying

summary judgment based on factual dispute as to whether the mark "was famous in the Dallas/Fort Worth region of Texas.").

Plaintiffs have stated a claim for dilution under the Texas statute. Plaintiffs allege use of the mark JIM ADLER for more than fifty years and use of the other Adler Marks for more than twenty years. *See* Dkt. No. 1 at ¶¶ 11-12, 17. The Adler Firm, which was founded in 1973, employees more than 300 persons and has four offices throughout the state in Houston, Dallas, San Antonio and Channelview. *See id.* at ¶12. Plaintiffs own federal registrations for the Adler Marks, all of which are incontestable under 15 U.S.C. § 1065. *See id.* at ¶ 20. Media outlets have recognized Jim Adler as a public figure, describing him as a "household name" and observing that "as far as personal injury lawyers go, Jim Adler might be the most well known in Texas." *Id.* at ¶ 16. Plaintiffs have spent more than $100 million on television, internet, radio, and billboard advertisements targeting the Houston, San Antonio, and Dallas/Fort Worth markets. *See id.* at ¶ 22. Plaintiffs purchase television, radio, and billboard ads in both English and San Antonio. *See id.* at ¶¶ 23, 26, 29. Plaintiffs run approximately 45,000 television commercials in Houston, 87,000 in San Antonio, and 85,000 in Dallas each year, and, between the three markets, the commercials reach more than half of the Texas population. *See id.* at ¶¶ 23-24.

3. <u>Plaintiffs state a claim for unjust enrichment.</u>

Defendant contends that Plaintiffs' enrichment claim should be dismissed because it is "subsumed" by their other claims for trademark infringement and unfair competition. *See* Dkt. No. 10 at 20-21; *Mary Kay*, 601 F. Supp. 2d at 864 ("where there

27

are other, more specific theories of recovery available–namely, trademark infringement and tortious interference–unjust enrichment should similarly not apply."). Other courts disagree. *See Tempur-Pedic N. Am., LLC v. Mattress Firm, Inc.,* No. CV H-17-1068, 2018 WL 4316427, at \*5 (S.D. Tex. July 13, 2018 (refusing dismissal based on argument that an "[u]njust enrichment is not actionable because [plaintiff] has available legal causes of action that cover the same subject"); *RPost Holding., Inc. v. Readnotify.com Pty. Ltd.*, No. 2:11-cv-16-JRG, 2012 WL 3201898, at \*2 (E.D. Tex. June 29, 2012) ("The Court agrees with Plaintiffs that unjust enrichment may be recovered based on a violation of federal and/or common law trademark infringement, where supported by the fact.").

Despite those disagreements, in cases addressing motions for summary judgment, courts routinely allow unjust enrichment claims to proceed past the motion-to-dismiss stage alongside claims for trademark infringement and unfair competition. *See YETI*, 2017 WL 2199012, at \*7; *Primesource Bldg. Prod., Inc. v. Hillman Grp., Inc.,* No. 3:14-cv-2521-B, 2015 WL 11120882, at \*8 (N.D. Tex. Mar. 31, 2015).

Because Plaintiffs may plead in the alternative, *see* FED. R. CIV. P. .8, their claim for unjust enrichment should not be dismissed at this stage of the proceedings.

4. Plaintiffs do not state a claim for misappropriation of business opportunity or of name and likeness.

Plaintiffs assert state law claims for misappropriation of name or likeness and misappropriation of business opportunity. Defendants contend that both claims should be dismissed with prejudice because "misappropriation of a trademark is not

a cause of action under Texas law." *Buc-cee's, Ltd. v. Shepherd Retail, Inc.*, No. 4:15-cv-3704, 2017 WL 4221461, at * 12 (S.D. Tex. July 21, 2017) (report and recommendation adopted in part, rejected in part on other grounds sub nom. *Buc-cee's, Ltd. v. Punjwani*, 4:15-cv-3704, 2017 WL 4221461 (S.D. Tex. Sept. 21, 2017).

Misappropriation is a state common law offshoot of the general law of unfair competition and invoked when the plaintiff creates a valuable "thing" that the defendant has "appropriated" at little cost. *Id.* (quoting McCarthy, § 10.07). The "thing" that the plaintiff seeks to protect must not otherwise be protected by another theory of recovery − and specifically, not by traditional common law theories of unfair competition, such as trademark infringement. *See id.* (quoting McCarthy, §§ 10.47–48); *accord Mueller Co. v. U.S. Pipe & Foundry Co.*, No. 03–cv–170, 2003 WL 22272135, at *3 (D.N.H. Oct. 2, 2003) ("the misappropriation theory [ ] has been reserved for the vindication of commercial rights left unprotected by trademark principles"). The *Buc-cee's* Court notes that "numerous other courts have rejected the theory of misappropriation of a trademark under state common law." *Id.* at 13 (listing cases).

Plaintiffs respond that the *Buc-cee's* decision is inapplicable because their misappropriation claims are not premised on their rights in the Adler Marks. Instead, they argue, the misappropriation of name or likeness claim is based on Jim Adler's privacy interest in the exclusive use of his identity, and their misappropriation of business opportunity claim is based on Jim Adler's sweat-equity interest in the time it took to develop his extensive commercial reputation.

The tort of misappropriation of one's name or likeness is generally referred to as the "Right of Publicity" and is based on section 652C of the Restatement of Torts which reads, "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." *Henley v. Dillard Dep't Stores*, 46 F. Supp. 3d 587, 590 (N.D. Tex. 1999) (quoting RESTATEMENT (SECOND) OF TORTS § 652C (1977)). The Fifth Circuit has specifically identified three elements a plaintiff must prove to recover for the tort of misappropriation of name and likeness in Texas: (1) the defendant appropriated the plaintiff's name or likeness for the value associated with it, and not in an incidental manner or for a newsworthy purpose; (2) the plaintiff can be identified from the publication; and (3) there was some advantage or benefit to the defendant. *See Matthews v. Wozencraft,* 15 F.3d 432, 437 (5th Cir.1994).

The objective of the tort of misappropriation of business opportunity is to "protect the labor − the so-called 'sweat equity' − that goes into creating a work" or product. *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 788 (5th Cir. 1999). To state a claim for unfair competition by misappropriation, a plaintiff must allege: (i) the creation of plaintiff's product through extensive time, labor, skill and money, (ii) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition (*i.e.,* a "free ride") because defendant is burdened with little or none of the expense incurred by the plaintiff, and (iii) commercial damage to the plaintiff. *See U.S. Sporting Products, Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 218 (Tex. App. − Waco 1993, writ denied).

Plaintiffs fail to allege facts to support either a misappropriation of name or likeness or misappropriation of business opportunity claims. The facts and allegations in the complaint are more akin to a claim for misappropriation of a trademark and, thus, precluded as a matter of law. Accordingly, the Court should dismiss Plaintiffs' misappropriation claims with prejudice.

5.  <u>Plaintiffs state a claim for tortious interference.</u>

Defendant argues that Plaintiffs fail to allege facts to support any element of their tortious interference with a prospective business opportunity claim. *See* Dkt. No. 1 at 20. To prevail on a claim for tortious interference with prospective business relations, the plaintiff must establish that (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. *See Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

In their complaint, Plaintiffs allege that they have expended significant resources in marketing and promoting their services across the state of Texas and, as a result of those efforts, have generated substantial revenue and profits. See Dkt. No. 1 at ¶¶ 21-36. They allege that Defendant committed numerous independent torts − trademark infringement, unfair competition, and common law misappropriation −

and diverted customers seeking Plaintiffs' services through unlawful means. *See id.* at ¶¶ 37-39. They also allege that Defendant knew of and exploited Jim Adler's reputation to divert customers, that those efforts were successful, and that Plaintiffs suffered actual harm in the form of lost profits. *See id.* These allegations are sufficient to state a plausible tortious interference claim.

II.   <u>The Motion for More Definite Statement should be denied.</u>

Defendant argues that Plaintiffs' complaint should be summarily dismissed as an improper shotgun pleading or, alternatively, that Plaintiffs should be required to make a more definite statement.

What makes a pleading a "shotgun" pleading is the inclusion of irrelevant and unrelated facts not tied to specific causes of action such that the claims made are indeterminate and the defendant's task in defending against them is significantly impaired. *See Bates v. Laminack*, 938 F. Supp. 2d 649, 667 (S.D. Tex. 2013). Defendant contends that Plaintiffs complaint is a "classic example" of a shotgun pleading, where "each count ... adopts the allegations of all preceding counts. Consequently, allegations of fact that may be material to a determination of count one, but not count four, are nonetheless made a part of count four.... [I]t is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1126 (11th Cir. 2014) (quoting *Anderson v. Dist. Bd. of Trs. of Cent. Florida Cmty. Coll.,* 77 F.3d 364, 366 (11th Cir. 2014). Plaintiffs recite 18 pages of factual allegations and then incorporate all prior allegations into each count. *See* Dkt. No. 1.

But this is not a case in which "the pleader heedlessly throws a little bit of everything into his complaint in the hopes that something will stick." *Roe v. Johnson County, Tex.*, 3:18-cv-2497-B-BN, 2019 WL 5031357, at *5 (N.D. Tex. July 29, 2019). Nor are the facts alleged by Plaintiffs irrelevant or unrelated to Plaintiffs' allegations of a fraudulent scheme actionable under each claim included in the complaint.

Plaintiffs' complaint should not be dismissed as an improper shotgun pleading.

If the Court does not dismiss Plaintiffs' complaint in its entirety, Defendants alternatively argue that Plaintiffs should be required to file a more definite statement under Rule 12(e). *See* FED. R. CIV. P. 12(e) ("A party may move for a more definite statement of a pleading…which is so vague and ambiguous that the party cannot reasonably prepare a response."). It argues that the complaint contains vague, indefinite, ambiguous, and conclusory allegations, which violate Federal Rule of Civil Procedure 8's basic pleading requirements and deprive Defendant of fair and adequate notice of Plaintiffs' claims. It further argues that Plaintiffs' claims do not provide allegations specifically definite to determine the specific factual and legal bases for each claim.

For the reasons discussed above, the undersigned disagrees and recommends that the Court deny the motion for more definite statement.

## Recommendation

Defendant's Motion to Dismiss Plaintiffs' Complaint or Alternative Motion for a More Definite Statement [Dkt. No. 10] should be granted in part and denied in part. The Court should grant the motion as to Plaintiffs' claims for misappropriation of

name or likeness and misappropriation of business opportunity and dismiss those claims with prejudice. Otherwise, the motion should be denied.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: August 7, 2020

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE